MCKENZIE CZABAJ, AZ # 036711
DAVID A. CHAMI, AZ # 027585
DANIEL COHEN, # 032552
**CONSUMER ATTORNEYS**
8245 N. 85th Way
Scottsdale, Arizona 85258
T: (480) 626-2376
E: mczabaj@consumerattorneys.com

*Attorneys for Plaintiff*
*John Gentile*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA
### PHOENIX DIVISION

| | |
|---|---|
| John Gentile, | Case No.: |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| LexisNexis Risk Solutions, Inc., | |
| Defendant. | |

### COMPLAINT

John Gentile ("Plaintiff") a living, breathing 59-year-old consumer, brings this action on an individual basis, against LexisNexis Risk Solutions, Inc. ("LexisNexis") and states as follows:

### INTRODUCTION

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better

1

1  decision-making by its recipients and, in theory, all of society should ultimately benefit
2  from the resulting convenience and efficiency.

3      2.      However, unfortunately this information has also become readily available
4  for, and subject to, mishandling and misuse. Individual consumers can and do sustain
5  substantial damage, both economically and emotionally, whenever inaccurate or fraudulent
6  information is disseminated and/or obtained about them. In fact, LexisNexis acknowledges
7  this potential for misuse and resulting damage every time it sells its respective services to a
8  consumer.

9      3.      The ongoing technological advances in the area of data processing have
10 resulted in a boon for the companies that accumulate and sell data concerning individuals'
11 credit histories and other personal information. Such companies are commonly known as
12 consumer reporting agencies ("CRAs").

13     4.      These CRAs sell information to readily paying subscribers (i.e., retailers,
14 landlords, lenders, insurance companies, potential employers, and other similar interested
15 parties), commonly called "consumer reports," concerning individuals who may be
16 applying for retail credit, housing, insurance, employment, or a car or mortgage loan.

17     5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C.
18 § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize
19 reasonable procedures "to assure maximum possible accuracy" of the personal, private, and
20 financial information that they compile and sell about individual consumers.

21     6.      One of the primary purposes in requiring CRAs to assure "maximum possible
22 accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

- 2 -

7. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10. The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11. Plaintiff's claims arise out of LexisNexis' blatantly inaccurate reporting, wherein LexisNexis reported to Plaintiff's potential creditors/insurers that he is "deceased."

12. Accordingly, Plaintiff brings claims against LexisNexis for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's consumer reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

13. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from LexisNexis for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

14. Plaintiff is a natural person residing in Scottsdale, Arizona, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15. LexisNexis is a Delaware corporation doing business throughout the United States, including the State of Arizona and in this District, and has a principal place of business located at 1000 Alderman Drive, Alpharetta, Georgia 30005. LexisNexis can be served at its registered agent, The Corporation Company, located at 40600 Ann Arbor Rd E, Suite 201, Plymouth, Michigan 48170.

16. LexisNexis is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). LexisNexis is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

# FACTS

## Summary of the Fair Credit Reporting Act

19. The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

20. The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

21. Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

22. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

23. The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## LexisNexis' Practices Concerning the Sale of Reports on the "Deceased"

24. LexisNexis sells millions of consumer reports per day.

25. Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like LexisNexis, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

26. Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like LexisNexis, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

27. LexisNexis routinely places a "deceased" notation or marking on reports when it is advised by any of its many data sources that a given consumer is deceased.

28. LexisNexis does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

29. LexisNexis does not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

30. LexisNexis does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

31. In some cases, in order to assure accuracy, LexisNexis may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. LexisNexis does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when LexisNexis has received information suggesting the consumer is deceased before adding that information to the consumer's credit file or report.

32. The Social Security Administration (SSA) maintains the **Death Master File ("DMF")**. The DMF is also known commercially as the Social Security Death Index

(SSDI). The SSA's DMF as of 2018 contained information on 111 million deaths that have been reported to the SSA. The DMF is created from internal SSA records of deceased persons possessing social security numbers and whose deaths were reported to the SSA. The DMF includes the following information on each decedent, if the data are available to the SSA: Social Security Number, name, date of birth, and date of death.

33. Legislation (i.e., the Social Security Act) precludes the sharing of the full DMF with non-benefits paying agencies.

34. Because of the wide use and demand for death records for a variety of industries, SSA has partnered with the U.S. Department of Commerce's National Technical Information Service (NTIS) to release the **Limited Access Death Master File (LADMF)** electronically on a weekly and monthly basis.

35. The SSA receives death reports from many sources, including family members, funeral homes, financial institutions, postal authorities, state information, and other federal agencies. The SSA does not have a death record for all persons; therefore, the SSA does not guarantee the veracity of the DMF.

36. The SSA estimates that roughly 12,000 living people are added to the DMF annually, potentially due to clerical error. An erroneous listing can lead to not only a cessation of government benefits, but also the freezing of bank accounts, the inability to buy or rent property, and mistaken accusations of identity theft.[1]

37. The Office of the Inspector General called the error rate "very low," but noted that "SSA's erroneous death entries can lead to mistaken benefit terminations and cause severe financial hardship and distress to affected people…when errors like this occur, it can be a long and difficult process to resurrect your financial health.[2]

---

[1] *Aviva Dekornfeld (2018-06-20). "The Plight of the Living Dead". The Indicator from Planet Money (Podcast).* Bichell, Rae Ellen (2016-08-10). "Social Security Data Errors Can Turn People into the Living Dead". *National Public Radio*.

[2] "Cases of Mistaken Death Reports Low but Costly | Office of the Inspector General, SSA". *oig.ssa.gov*. 2016-03-24. Archived from the original on 2020-07-16.

38. LexisNexis does not have access to the full DMF from the SSA, but rather is a subscriber to the NTIS LADMF.

39. Despite being a subscriber to the NTIS LADMF, LexisNexis does not cross-reference the information it has received suggesting a consumer is deceased with the LADMF in order to determine whether any given consumer reported as deceased via its source is also on the LADMF before selling a consumer report about said consumer, or at any time.

40. LexisNexis fails to employ reasonable procedures that assure that a consumer is actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

41. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, LexisNexis does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark in that consumer's file.

42. Even in instances where the purportedly deceased consumer communicates directly with the LexisNexis, LexisNexis does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark on that consumer's report.

43. LexisNexis knows that living consumers are routinely turned down for credit, insurance, employment, and/or housing specifically because LexisNexis has reported the consumer as "deceased."

44. LexisNexis has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit and other opportunities specifically because LexisNexis is inaccurately reporting them as "deceased."

45. LexisNexis has received and documented many disputes from consumers complaining that LexisNexis had erroneously marked them as "deceased" on their consumer reports.

46. LexisNexis knows that thousands of consumers are erroneously marked as "deceased" on their consumer reports.

47. Nevertheless, LexisNexis does not employ any procedures to assure that a consumer is actually deceased before adding a "deceased" notation to that consumer's consumer reports.

48. LexisNexis does not employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

49. For years after a consumer's actual death, LexisNexis will continue to sell consumer reports about that consumer.

50. LexisNexis will only remove a deceased consumer's file from its respective consumer reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

51. LexisNexis charges third parties a fee for reports with a mark that a consumer is deceased as they would for any other report.

52. LexisNexis profits from the sale of reports on deceased consumers.

53. LexisNexis knows that truly deceased consumers do not apply for credit.

54. LexisNexis knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to LexisNexis to be a common and major source of identity theft.

55. LexisNexis knows that identity theft and credit fraud are serious and widespread problems in our society.

56. LexisNexis sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

57. For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for the LexisNexis to sell their consumer reports, absent a court order.

58. LexisNexis knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Plaintiff Loses Access to the ApplePay Platform**

59. Plaintiff owned and operated a food truck, which was Plaintiff's primary source of income at the time.

60. In or around June 2023, Plaintiff encountered a serious problem when attempting to process a customer's payment through ApplePay.

61. Specifically, Plaintiff received an error message indicating that Plaintiff needed to verify his identity in order to continue using ApplePay's services.

62. Accordingly, Plaintiff began the verification process, during which, an ApplePay representative informed Plaintiff that he was being reported as deceased.

63. The ApplePay representative informed Plaintiff that there was nothing it could do; he would need to resolve the deceased reporting with LexisNexis.

64. Upon information and belief, LexisNexis was the source of the "deceased" notation that was published to ApplePay.

65. Upon information and belief, LexisNexis published a consumer report to ApplePay wherein it reported that Plaintiff was deceased.

66. Upon information and belief, ApplePay terminated Plaintiff's access to ApplePay's services based upon the contents of a consumer report LexisNexis sold about Plaintiff.

67. Plaintiff was confused, distressed, and shocked by the reporting that he was "deceased." Certainly, Plaintiff was not deceased.

68. Plaintiff was particularly frustrated that he lost access to ApplePay because of the convenience that ApplePay provides to small business owners like Plaintiff.

69. And further, since Plaintiff was unable to re-gain access to ApplePay, there were multiple payments from customers that did not process. Plaintiff was then forced to call the customers and ask them to remit payment again. Many of Plaintiff's customers refused as on their end, payment appeared to have been sent, and others never returned Plaintiff's calls, causing him to lose out on the earnings from those sales.

70. However, Plaintiff assumed the deceased reporting to be a fluke because he was clearly alive.

71. Thereafter, attempted to collect payment using other payment methods, but many of his customers could only pay using ApplePay, causing trouble for his business.

72. This was the last straw for Plaintiff. Accordingly, he closed his food truck business.

**Plaintiff Applies for a Synchrony/Venmo Debit Card August 2023**

73. In or around the beginning of August 2023, Plaintiff decided to apply for a Venmo card.

74. Plaintiff desired the Venmo card because it would allow him to use money in his Venmo account to purchase things online or in-person, as opposed to having to wait for money to be transferred to a separate bank account.

75. On or about August 3, 2023, Plaintiff completed and submitted an application with Venmo/Synchrony for a debit card.

76. Plaintiff, believing the previous deceased reporting was a fluke, had no reason to believe he would be denied for the debit card.

**Venmo/Synchrony Denies Plaintiff's Debit Card Application August 2023**

77. Upon information and belief, Venmo/Synchrony ordered a consumer report about Plaintiff from Defendant on or about August 3, 2023.

78. Upon information and belief, Defendant published information about Plaintiff to Synchrony/Capital One in response to that credit application on or about August 3, 2023.

79. Upon information and belief, after reviewing Defendant's report about Plaintiff, Venmo/Synchrony denied Plaintiff's credit application.

80. Specifically, Venmo/Synchrony denied Plaintiff's credit application because Plaintiff was being reported as deceased.

81. Upon information and belief, Venmo/Synchrony denied Plaintiff's credit application based upon the contents of a consumer report Defendant sold about Plaintiff.

82. Plaintiff was disappointed that he was once again having issues due to inaccurate deceased reporting. Clearly, Plaintiff was alive. Plaintiff found that information to be very distressing and confusing.

**Plaintiff's Dispute to Defendant Regarding the Inaccurate Consumer Reporting in August 2023**

83. After the Venmo denial, Plaintiff no longer believed the deceased reporting was a fluke.

84. In or around August 2023, Plaintiff called Defendant in an attempt to dispute. However, no matter how many times he called, Plaintiff could not get through to anyone; he wasted hours on hold.

85. After doing some research, Plaintiff discovered that he could dispute by mail.

86. Plaintiff located a dispute form online, printed it out, and completed the form. As a part of the form, Plaintiff provided his Social Security number and indicated that he was disputing Defendant's inaccurate reporting of him as deceased.

87. Plaintiff requested that Defendant send him a corrected copy of his consumer report.

88. On or about August 19, 2023, Plaintiff received a response to his dispute.

89. However, Plaintiff was quite unsure what the twenty-two pages of results was informing him.

**Plaintiff Obtains His Consumer Report and Confirms that Defendant was Reporting Him as Deceased**

90. After reviewing the dispute response from LexisNexis, it was unclear to Plaintiff whether he was still being reported as deceased. Accordingly, Plaintiff decided to review his LexisNexis consumer report again.

91. Plaintiff reviewed his LexisNexis report in or around October 2023.

92. Upon review, Plaintiff discovered that LexisNexis was no longer actively reporting that he was deceased.

93. Upon information and belief, Defendant removed the deceased notation after receiving Plaintiff's dispute in or around August 2023.

94. However, Plaintiff also discovered that LexisNexis had previously published information indicating he was deceased to multiple other entities.

95. Specifically, upon information and belief, LexisNexis reported a "deceased" notation to the following insurance companies on the following dates: Hugo Insurance (April 30, 2023); State Farm Mutual (May 11, 2023); American Family Mutual Insurance (May 19, 2023); Hugo Insurance (May 19, 2023); Progressive POS (May 30, 2023); Allstate ACCNO (June 1, 2023); Allstate Ins Co (June 1, 2023); Allstate ACCNO (June 1, 2023); Progressive Pos (July 24, 2023); State Farm Mutual (July 25, 2023).

96. In or around early 2023, Plaintiff was informed that his insurance rates were going to increase.

97. Plaintiff was shocked and confused as he did not believe there were any circumstances that would justify such an increase; Plaintiff was not involved in any recent accidents and did not receive any tickets.

98. Accordingly, over the next couple of months, Plaintiff attempted to obtain several quotes for other insurance companies.

1     99.    However, Plaintiff was unable to obtain any lower or more reasonable rates.

2     100.   Once again, Plaintiff was confused. He did not understand why the insurance rates were so high.

4     101.   Upon information and belief, Plaintiff's insurance rate increased due to Defendant's inaccurate reporting of Plaintiff as deceased.

6     102.   Upon information and belief, the insurance quotes Plaintiff received were inexplicably high due to Defendant's inaccurate reporting of Plaintiff as deceased.

8     103.   Upon information and belief, in response to each of Plaintiff's insurance applications, LexisNexis sold consumer reports to Plaintiff's prospective insurance providers which indicated that he was deceased.

11    104.   Plaintiff was deeply upset to learn LexisNexis had repeatedly reported that Plaintiff was deceased to his insurer and prospective insurers.

13    105.   Plaintiff was particularly frustrated because he desired a more affordable insurance plan.

15    106.   Plaintiff was also concerned that his insurer and prospective insurer believed he was engaged in fraudulent behavior.

17    107.   LexisNexis had every reason to know that Plaintiff was not deceased. Defendant was receiving updates concerning Plaintiff from its sources and receiving requests from third parties for copies of his consumer report, evidencing that Plaintiff was actively applying for credit.

21    108.   Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the consumer information it published and maintained concerning Plaintiff.

24    109.   As a result of the deceased notation, Defendant made it practically impossible for Plaintiff to obtain credit.

26    110.   As a result of the deceased notation, Plaintiff could not obtain affordable insurance.

111. At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

112. At all times pertinent hereto, the conduct of Defendant, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

113. Defendant is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs. Accordingly, the Defendant's violations of the FCRA are willful.

114. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his credit rating; detriment to his credit rating; wasted time; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

115. As a direct result of Defendant's conduct Plaintiff feared that he was the victim of identity theft; or that his prospective creditors thought he was engaging in fraudulent behavior.

116. The inaccurate deceased reporting also caused financial struggles for Plaintiff as it contributed to him closing his food truck business.

117. Defendant's conduct also caused stress, anxiety, and frustration.

118. Consequently, Plaintiff suffered from sleepless nights.

119. In addition, Defendant's conduct caused tension between Plaintiff and his wife.

120. Plaintiff's time was also wasted by having to make phone calls, sit on hold, mail a dispute form, and review his consumer reports.

121. Plaintiff is also fearful that he will be dealing with the inaccurate deceased report until the day he *actually* dies.

# CLAIMS FOR RELIEF

## COUNT I

## 15 U.S.C. § 1681e(b)

## Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

122. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

123. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

124. On numerous occasions, Defendant prepared patently false consumer reports concerning Plaintiff.

125. Despite actual and implied knowledge that Plaintiff is not dead, Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

126. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports it published and maintained concerning Plaintiff.

127. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; wasted time; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

128. Defendant's conduct, actions, and inactions was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the

Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

129. Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i. Determining that Defendant negligently and/or willfully violated the FCRA;

ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Date: January 18, 2024.

*/s/ McKenzie Czabaj*
McKenzie Czabaj, AZ # 036711
David A. Chami, AZ # 027585
Daniel Cohen, AZ #032552
**Consumer Attorneys PLC**
8245 N. 85th Way
Scottsdale, Arizona 85258
T: (480) 626-2376
E: mczabaj@consumerattorneys.com

*Attorneys for Plaintiff John Gentile*

//

**CERTIFICATE OF SERVICE**

I hereby certify that on January 18, 2024, I electronically filed the foregoing document with the Clerk of the Court using the ECF system. Notice of such filing will be sent to all attorneys of record in this matter. Since none of the attorneys of record are non-ECF participants, hard copies of the foregoing have not been provided via personal delivery or by postal mail.

By: */s/ Gracelyn Stewart*
Gracelyn Stewart